Morning all. We will have three cases today. And I would like to introduce, we have visiting with us, Judge Richard Stearns of the District of Massachusetts, who is sitting by designation and assisting our circuit with its workload, for which we are most grateful. We will start with Garza v. Warden Allenwood, No. 19-2111. Ms. Garrison. Good morning, Your Honors, and may it please the Court. Carrie Garrison, Porter Wright Morris and Arthur, for the appellant, Mr. Albert Garza. I would like to request two minutes for rebuttal. Granted. Thank you. This case is about an 80-year-old prisoner, Mr. Albert Garza, who has served nearly 50 years in prison and has been unconstitutionally denied parole since 2013. Mr. Garza respectfully requests that this Court reverse and vacate the opinion and order of the District Court, enter an order granting his 2015 habeas petition, and order his immediate release on parole. Can I start out just asking you about the mandatory parole claim to make sure I understand what it is being argued there? Because under 4206D, it's not mandatory in an unqualified way. So what exactly is the claim as to an entitlement to release on mandatory parole? Yes, Your Honor. Mr. Garza's 2013 and 2015 habeas hearings or parole hearings, the United States Parole Commission applied 4206D, and Mr. Garza is arguing today that that was the correct application. However, the parole commission's use of certain facts, including his expunged escape incident report, was a violation of his due process rights. So the mandatory parole claim is part and parcel of the due process claim? Yes, Your Honor. Mr. Garza's mandatory parole claim is that 4206D applies to him, and that's been conceded by the government, and the parole board has applied 4206D. However, when the parole board applied 4206D, it unconstitutionally used his expunged escape incident report. Is it mandatory parole or mandatory parole hearing? Your Honor, it is a mandatory parole hearing. However, Mr. Garza alleges that the parole commission unconstitutionally used his expunged incident report to deny him parole. So while he was given this parole hearing that is required under 4206D, the USPC incorrectly applied it to him as they utilized the expunged escape incident report to deny him parole. You weren't saying that they couldn't consider the 1979 escape, are you? No, Your Honor. The parole commission can constitutionally rely on the fact of the escape. However, under due process, it had a duty to make that clear in its statement of reasons, and it did not. In fact, the appendix shows on pages 81 and 82 that the parole commission stated that Mr. Garza was denied parole because he violated the rules of the institution. So that is clearly referencing the expunged escape incident report. Why isn't that information that you could glean from the fact of his convictions and the underlying conduct there? Your Honor, it's the language that the parole commission used that Mr. Garza seriously violated the rules and regulations of the institution. If the commission had been relying on the fact of the escape, why would they have utilized that language? Well, isn't that the language of the statute? Yes, Your Honor, it is. However, there is other language in that statute as well. It states that parole can be denied if the commission believes there is a reasonable probability that the inmate will commit a future crime. And if the parole commission had relied on the fact of the escape or the conviction, they should have relied on that language instead of the language that they used, which is that Mr. Garza seriously violated the rules and regulations of the institution. That language clearly shows that the parole commission relied on the expunged escape incident report. And this court has acknowledged that the parole commission cannot rely on facts that are not in the record before it. And an expunged escape incident report is not properly in the factual record. What if the incident report, even if expunged, had facts in it? So they're not relying on it for the fact of the consequences that it may have, but for the underlying facts in it. You aren't saying that they couldn't even use that as evidence of something, are you, of the escape? No, Your Honor. The parole commission can rely on the conviction or the fact of escape, but due process makes it clear that it had a duty to make that clear in its statement of reasons. And it didn't. The statement of reasons states that Mr. Garza was denied parole because he seriously violated the rules and regulations of the institution. And these rules and regulations of the institution, the remedy for violations of these, is an incident report, not a conviction. So the parole commission did violate Mr. Garza's due process rights in both 2013 and 2015 when it issued this statement of reasons that clearly relied on this expunged incident report. But what is the consequence of expungement? I can understand that it might remove the disciplinary ticket, so to speak, from his inmate record. But why does it remove the fact of an institutional violation of rules? Your Honor, it does not remove the fact of the underlying conviction or the facts of the escape, but it does remove that incident report from the record before the parole commission. But the commission didn't say it was relying on the report, did it? It did not explicitly state that it was relying on the report. However, it stated that it was denying Mr. Garza parole because he seriously violated the rules and regulations of the institution, which very clearly shows that the commission relied on the expunged incident report. And that incident report has been expunged since 1985. Further, the commission violated Mr. Garza's ex post facto rights by applying regulations that were not in effect at the time of his original offense and significantly increased the risk of a negative parole recommendation. The regulations that the United States Parole Commission applied were 28 CFR sections 2.23 and 2.24. These differ to the regulations that were in effect at the time of Mr. Garza's original offenses in 1973. But there's also a major change in 1976, right, in terms of the parole statute. And he has two convictions that span that. So which one should we be looking at for the appropriate parole scheme? And how were the schemes in 73 and 79 different than in 2.23 and 2.24? Yes, Your Honor. Mr. Garza did commit offenses in 1973 and 79, and the Parole Commission and Reorganization Act happened in 1976. And the 1987 Sentencing Reform Act states that the PCRA of 1976 is applied retroactively to all crimes that were committed before 1987. So the PCRA does apply to all of Mr. Garza's crimes. However, as far as the parole regulations that are to be used, the Supreme Court recognized in Weaver v. Graham that parole eligibility affects the punishment attached to the original crime. And therefore, the regulations in place at the time of Mr. Garza's original crimes in 1973 should have been applied to his parole determinations in 2013. What was it in 73? Was that a single reviewer? Was that two reviewers? What are we comparing? Yes, Your Honor. In 1973, the regulations stated that there were two options. Either a majority vote of two parole commissioners could determine parole, or a hearing examiner would review the prisoner's hearing, the parole hearing, and issue a recommendation, which would then go before two United States Parole Commission members where they would vote. And this differs significantly from the regulations that were applied to Mr. Garza. Those regulations provided that a hearing examiner would first recommend whether or not to parole the inmate, and then an executive reviewer would then review that recommendation and issue their own recommendation. Why isn't that more protective than the original version? No, Your Honor. The regulations that were applied, they are not more protective as they cause significantly more steps to take place before the recommendations are reviewed by the United States Parole Commission and a final determination. Let me ask it this way. If the hearing examiner denied or recommended denial of parole, could the executive examiner reverse that decision and make a different recommendation to the commission? Yes, Your Honor. Was that a two-byte at the apple? No, Your Honor. While you are correct that the executive reviewer could disagree with the first hearing examiner, if they disagreed, then the vote would go before multiple other hearing examiners, causing multiple other steps in this process before the recommendations went before the United States Parole Commission for a final determination. And these multiple steps that were applied here, they cause significantly more opportunity for a negative parole recommendation. But isn't the test for ex post facto not whether there's a significant risk of a greater negative parole recommendation, or isn't it really a significant risk of increased punishment? Yes. And the decision makers are not bound by the recommendation in any way. They're actually independent decision makers. And so it seems to me that the more recommendations that you have in the record, one way or the other, the more vibrant those decision makers are going to be able to, more vibrantly, they're going to be able to discuss the issue, consider the issue, and make a decision. And it's just not obvious to me that when you give them more recommendations that you can say, ah, the presence of potentially more recommendations significantly increases the likelihood of punishment, of increased punishment. Your Honor, these increased amount of recommendations, they do increase the likelihood of more punishment because these recommendations are issued for a reason. The United States Parole Commission relies on these recommendations to have the factual record before it to issue its parole decisions. And these recommendations influence the Parole Commission. So the previous regulations that should have been applied, they allow for only one recommendation, which provides for a certain amount of influence. However, the regulations that were applied to Mr. Garza, they allow for significantly more influence upon the United States Parole Commission's decision. And that is precisely why, as applied to Mr. Garza, they were an ex post facto violation in his case. So this is a hypo, but just to apply it here, if we were to extend the oral argument time in this case, or in a case from 15 minutes to 30 minutes for everyone, would you say that that might significantly increase the risk of an adverse ruling for one side or the other? It's possible, Your Honor. As applied to the facts of this case, I believe that the significant increase in time could allow for more influence upon the final ruling. So no doubt it could. But, I mean, the ex post facto analysis isn't in this potential space. It's governed by significant risk. And so it's one thing to say that if we doubled oral argument time or if there's more reviewers, there could possibly be influence that changes the outcome. But we have to look at this, especially since these are matters of procedure, through the lens of is there a significant increase? And it's not obvious to me that we can say assuredly that there is. How do we know that more often than not, or a great likelihood or a high percentage of the time, this is going to work against inmates? Your Honor, I see my time is up. May I have leave to answer your question? You may. I believe answering your question is best illustrated by a probability. So in these regulations that were in effect in 1973, at the time of Mr. Garza's crime, they allowed for a two-step process where we can see that the likelihood of both answers being yes would be 25%. Whereas in the at least three-step process that was applied to Mr. Garza, this decreased the chances of three yes votes by half. Look, that would be totally true if the recommenders were flipping a coin heads or tails to find out which way they would recommend, because that's straight-up probability for flipping coins, right? But I'm not sure that we want to reduce the recommendation process for parole and analogize it to probabilities for coin flips. I understand, Your Honor. However, because 18 U.S.C. 4206D applies to Mr. Garza, this is more akin to a coin flip, as the Tenth and D.C. Circuits have recognized that 4206D creates a rebuttable presumption in favor of parole. So while parole may be seen as more of a likelihood of not being paroled is more likely, it is actually more akin to a coin flip, especially because 4206D was applied to Mr. Garza. Thank you. We'll hear from you on rebuttal. Good morning, Your Honors. May I please the court? Counsel. My name is Brian Simpson with the U.S. Attorney's Office, and I'm here on behalf of the government, the warden of Allenwood, and the parole commission in this matter, Your Honor. The court should affirm the district court's decision denying Mr. Garza's habeas petitions because there was a rational basis to deny him parole under 4206D. That rational basis was the parole commission's finding that his convictions for escape from a federal prison in 1979 and attempted murder of a law enforcement officer during that escape in 1979 constituted a significant violation of institutional policies. And therefore, under 4206D, they were required to deny him parole once they met that finding. Excuse me. Counsel, we'll talk those merits. But just as a threshold matter, are you still pressing the argument about abuse of the writ? Your Honor, I think an argument could be made and has been made. I don't think it's in the government's interest to focus on that in this instance here. I'd also like to use this to acknowledge there's an unintentional misstatement in page 17 of my brief. I indicated that the 2018 decision from Judge Conaboy found abuse of the writ with respect to the due process claim as interpreted by the court in 2012. That's not correct. On my part, the court's decision with respect to abuse of the writ was that he was entitled to mandatory parole equaled mandatory release, to phrase it a different way. And also that to the extent he was, again, alleging a somewhat vague, at least by the 2012 or 2013 petition, that there was an ex post facto violation that was also abuse of the writ. But with that clarification. I understood your abuse of the writ argument. It was almost like sealing off certain challenges and saying, hey, if you're trying to use the writ to relitigate things that have happened before, then that might be an abuse. But from what I can tell, what has been the focus of this case is not to relitigate those points. And so consequently, it sounds to me that you raised this point basically to say, hey, we don't want this to be an opportunity for you to bring up a whole bunch of other stuff. But at least the issues that your adversary has raised don't seem to be the ones that were necessarily relitigated that were litigated beforehand. Is it your position that the ex post facto and the due process challenges were litigated and would be in us considering them now would be an abuse of the writ? Your Honor, I don't believe it would be an abuse of the writ for this court to consider it. Nor was it an abuse of the writ for Judge Conaboy in the 2015 to consider it with respect to the 2015 hearing. What happened at the 2013 hearing, the 2012 petition? I don't know that that's worth the court's time or our time focusing on that anyway, since there was a 2015 hearing subsequent to that. I think the remedy, if the court found the 2012 petition, excuse me, Your Honors, and the 2013 hearing to be inadequate, the relief would be to send it back to the Parole Commission to do again. They did that in 2015. The outcome was the same. I think it's in the best interest of everybody if we focus on the 2015 hearing and the 2018 decisions. Just to put in mind there, what were the legal ramifications in your mind to the expulsion or the expungement order? What does it signify or mean in terms of subsequent proceedings? In this case specifically, Your Honor, I don't believe there is any impact to it because the BOP, Bureau of Prisons, forgive me the acronyms that come with the job. The Bureau of Prisons DHO sanction was not considered by the Parole Commission. Had it been considered specifically, that may be an issue. But even if it were, there would be the workaround that they could consider the criminal convictions, which is what they did here. Or they could have considered the fact underlying that issue, even if he had not been convicted of it. The regs 28 CFR 2.19, I believe, allowed the Parole Commission to consider charges in an indictment that may have been dropped and even instances where an individual was found not guilty. But your opponent says that if they wanted to consider, I don't think your opponent disputes it, they could have considered those. And if they did consider those and if they did rest their ruling on those, there wouldn't be a problem. I think what her point is is that it's not clear that that was the basis for the decision. And because it's not clear that's the basis for the decision, there could be a constitutional problem with over relying on expungement. And so it seems that she's saying that that lack of clarity amounts to due process problem. What do you say? Your Honor, not in this case. It's looking at the hearing summary, which is available in the appendix here. I believe it's page 68 through approximately page 74. It walks through a number of incidents that were considered and reviewed by the hearing examiner. Items 1 through 25, I believe, specifically reference in most instances a BOP incident report number. And the basis for a finding cites a DHO finding on a certain date and normally the admission of Mr. Garza as the basis for the finding. When you get to 27 and 28, 27 is the escape from the prison. The basis for that is cited as criminal conviction and admission. There is no reference to a DHO report or a DHO finding. Also then for the last item, I believe 28, attempted murder, the site there for the basis is the conviction in state court and the admission. Makes clear in this instance the hearing examiner and the parole, the hearing examiner was making a distinction to what were BOP sanctions that they considered and then the criminal convictions. As to the actual language that was in the decisions issued by the Parole Commission and then the Board of Appeals as well, it is our position that the language used is the specific language under 4206D. There are two reasons the rebuttable presumptions that come with it are in essence an ongoing threat to the community if released. That was not cited in Garza. In the defer case that recently came out of the D.C. Circuit, that was what they did rely upon. And in the Coleman v. Parole of Commission case, a 2018 case from the Third Circuit, that also focused on the seriousness of the offense. In Mr. Garza's case, like Bowers, the focus in denying, in fact the only reason, was the escape and the attempted murder during constituted a significant or substantial violation of institutional policy. Therefore, they were required to deny him parole. That's the language that is used. I appreciate they could have gone on longer. I don't believe that they're required to, and I don't think the fact that they didn't draw the distinction out more here gives rise to a constitutional violation. You talked to us about the ex post facto claim. And as I asked your colleague on the other side of the aisle, what is it that we're comparing here in terms of the two relevant schemes? Your Honor, I'd like to begin with the admission. It's very complex. As to an extent, so are the Parole Commission's changing titles over the years. I believe it is the 76 standard that should apply to both. But under either standard, the 76 standard I'd refer to or describe as requiring two hearing examiners to agree on a recommendation that then goes to a commission that is free to accept or reject. If one commissioner rejects, then he or she is required to get the vote of a second commissioner before it progresses. As I understand it, before the 76 law came into effect, there would have been one reviewer, not by that title, who makes a recommendation to the parole board that is then still free to accept or reject. Under either statute, I apologize. Well, yes, actually they were statutes. In essence, it's the same process. A matter is reviewed by one or two or more, actually, depending on how many it takes to get to an agreement to make the recommendation. But it is a recommendation after review that goes to the parole commission or the board before that that is free to accept or reject. The changing titles over the years have not fundamentally changed the process. And as the Supreme Court noted in Morales v. California Department of Corrections, quoted in Garner, the ex post facto when it comes to the parole regulations should not be used to micromanage all changes to terms and procedures throughout the process. Speak of those changes, and this wades a bit into the complexity. You said that you think that the 76 procedures should apply to both. I get why that would apply to the 79. Why? Why would that also apply to the 73? And with the acknowledgement that I could be mistaken, Your Honor, I think that it was to apply to everything committed before that. I think if pre-76, I believe Mr. Garza may not have even been eligible for parole at all for the crime that he had committed. But I would like to acknowledge I'm not 100 percent certain on that. So how does what happened here align with the way you've described the current scheme? Because it appears that there was a single hearing examiner who recommended that he be granted parole. And then the executive reviewer disagreed with that. So where are the two at the outset who were supposed to reach consensus? And why aren't we seeing this match up with the regulations? I believe what happened matched up with the regulations. I would acknowledge, though, what is not in the record is what the tie-breaking vote was from a third hearing examiner. The executive reviewer is actually just a hearing examiner. So what is clear is in both instances a hearing examiner recommended parole. The executive reviewer, which at that time would have been the second hearing officer, disagreed with that recommendation. There is nothing in the record that indicates what a third hearing officer did, whether they agreed with the recommendation or did not. All that we can take from the record is a recommendation went to the commission that had had two reviewers in agreement one way or another. And that commission made its decision, which it was free to accept or deny whichever recommendation it received, and determined not to release him under 4206D, finding the significant violation of institutional policy. Through the examiners, the ultimate recommendation to the parole commission was to deny parole. I don't know that, Your Honor. And it's not clear in the record. I must admit. I do not know that. If it were clear, then you could infer that the third examiner had agreed with the second and disagreed with the first. Not necessarily, Your Honor, because there are history in the BOP, excuse me, with the parole commission. Again, I apologize for that. There are instances where, and the regulations provide for an instance, where a parole commission would reject the recommendation that they received. I think it's here. It appears that that was the case, but it's not clear in the record. And I will not say otherwise to the court. No matter what changes took place, the parole commission still has broad discretion over the ultimate decision. I apologize. Yes, Your Honor. So it leads us back to an abusive discretion standard on review. All right. With respect to which decision? It could be a rational basis decision as the underlying, in this case I'm going to say offenses, the escape and the attempted murder. Those have to provide a rational basis to find, to deny parole based upon the 4602D mandatory language. The changing titles over the years of whether it was a regional hearing examiner or an executive reviewer, or now it has just been reverted back to just another examiner, that does not matter. If you look at the regulations, some of them specifically, I think it is the 1995 regulation, which is in Federal Register, I believe the 60th volume, it refers to a title change of the positions. And then the last change in 2019, when the parole commission did away with the executive reviewer, as mentioned in the brief, the regulations make clear in that, that was being done in large part to try and simplify and clarify the roles that these had over the years. It was a second reviewer. The changing nomenclature certainly has caused confusion. It has not caused an ex post facto violation in this case or in any others, if that's what the issue is, is the actual title of the hearing reviewers. Ms. Garrison's position is that adding in more, as I understand it, adding in more people to make this decision is significantly increasing the risk that parole will be denied, at least recommended as denied with whatever flows from that. We've said that you need to put forward evidence to substantiate a claim like that. And she identifies a number of cases where folks with more significant records were granted parole. What is your position as to that evidence and if that's enough for them to move forward with their case? I see I'm out of time here. With all due respect, I don't think citing to individuals who have received parole is relevant to this case before the court. The Parole Commission is composed of different individuals at different times. They make different recommendations for different individuals. The court, we certainly, they haven't provided enough evidence as the various factors that were or were not considered by the Parole Commission in deciding the release of individuals. As we have seen in some of the cases cited before the courts, leaving aside just the news counts, the Bowers case out of the 11th Circuit defer and Mr. Garza, the Parole Commission went different ways. Sometimes the basis to deny parole was determination that there was a serious threat to the community going forward. In other instances, such as Garza and Bowers, that was not a reason granted by the, or excuse me, cited by the Parole Board for the reason to deny mandatory parole. So I don't think pointing to other individuals really meets the burden of an ex post facto violation, that there is a significant likelihood that that will increase the punishment that he has received. I think it is speculative at best, and it could vary depending on what the panel makeup is. Thank you. Thank you very much. Thank you. Ms. Garrison, can you address the evidence that you have put forward, and why that should be persuasive here as to the effect on your client of adding another reviewer? Yes, Your Honor. You pointed out that I cited to multiple cases where prisoners with significantly worse records than that of Mr. Garza were paroled under 4206D. For example, Zvonko Busik, who was an Israeli spy for the Navy and planted a bomb that killed a police officer. He was paroled under 4206D. These cases show that Mr. Garza should have been paroled, and that the application of these regulations to him increased his risk of punishment as these individuals that were paroled had significantly worse records than that of Mr. Garza. How does that relate to the involvement of an executive reviewer? Wasn't an executive reviewer involved in their cases as well? I am not entirely sure if an executive reviewer was involved in their cases. However, they were paroled under 4206D, so it is likely that since 4206D comes from the 1976 statute, that an executive reviewer would have applied to their cases. But, I mean, at one level, it strikes me that the parole determination is, I think, made up of a lot of considerations, not just the underlying offense that may bear on it. And so it strikes me that the comparators that you're looking at are people who you say had worse offenses. And at one level, okay, that's a basis for comparison. But this is a multifaceted analysis. And so how do we know that there weren't other variables that tilted in favor of those individuals' parole that don't tilt in your client's favor of parole? It sounds that we can't do... It seems fraught with peril to reduce a multifactor analysis to a single variable comparison. And isn't that, in essence, what your comparators are? You can answer and sum up. Your Honor, that's not entirely our comparators here. The best way for us to determine what the Parole Commission used in this multifactor analysis is their statement of reasons. And as the record here indicates, the United States Parole Commission utilized Mr. Garza's bondage escape incident report to deny him parole. And that is clear because they stated that Mr. Garza was denied parole because he seriously violated the rules and regulations of the institution. Thank you. Thank you. And we thank both counsel for arguments. We'll take a piece under advisement.